UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTY ANNE KAUFFMAN,

                Plaintiff,         Case No. 12-11923
                                        Honorable Denise Page Hood
                                        Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]**

       Plaintiff Kristy Anne Kauffman ("Kauffman") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 17], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

       For the reasons set forth below, the court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Kauffman is not disabled under the Act. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Kauffman's Motion for Summary Judgment [14] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

II.    **REPORT**

A.    **Procedural History**

On August 19, 2008, at the age of 30, Kauffman filed applications for DIB and SSI, alleging a disability onset date of May 30, 2005.  (Tr. 108-17).  These applications were denied initially on December 29, 2008.   (Tr. 60-68).   Kauffman filed a timely request for an administrative hearing, which was held on May 27, 2010, before ALJ Elliott Bunce.  (Tr. 31-57). Kauffman, who was not represented by an attorney, testified at the hearing, as did her father, Anthony Kauffman, and vocational expert ("VE") Melody Henry.  (*Id.*).  On June 10, 2010, the ALJ found that Kauffman was not disabled.  (Tr. 11-24).  On March 8, 2012, the Appeals Council denied review.  (Tr. 1-5).  Kauffman filed for judicial review of the final decision on April 30, 2012 [1].

B.    **Background**

1.    *Disability Reports*

In an August 19, 2008 disability field office report, Kauffman reported that her alleged onset date was May 30, 2005.  (Tr. 125).  The claims examiner noted that, during a telephone interview, Kauffman did not have any difficulty hearing, understanding, concentrating, talking, or answering questions.  (Tr. 127).  The claims examiner further noted that Kauffman "was able to answer questions without difficulty."  (*Id.*).

In an undated disability report, Kauffman indicated that her ability to work is limited by left shoulder and neck injuries.  (Tr. 130).  When describing how these conditions limit her ability to work, Kauffman stated, "I am not supposed to lift over 5 lbs and I have limited mobility in my neck."  (*Id.*).  Kauffman reported that these conditions first interfered with her ability to work on May 30, 2005, and that she became unable to work on that date.  (*Id.*).  She stopped working because she was in "a lot of pain," could not sit or stand for very long, and

needed to be able to rest her neck. (*Id.*). She has not worked at all since May 30, 2005. (*Id.*).

Kauffman completed high school but had no further education. (Tr. 136). Prior to stopping work, Kauffman worked in various jobs, including bartender/cook/waitress, cashier/stock, counter helper, hostess, housekeeper, and retail manager. (Tr. 131). The job she held the longest was bartender/cook/waitress (from 1997-2004). (*Id.*). In that job, she cooked, waited tables, served food, and put away stock. (*Id.*). She was required to walk seven hours per day; stand one hour per day; stoop and crouch four hours per day; and reach and handle large and small objects eight hours per day. (*Id.*). She was frequently required to lift 25 pounds, and the heaviest weight she lifted was 50 pounds. (Tr. 131-32).

Kauffman indicated that she had treated with several medical providers regarding her left shoulder and neck injuries; however, she had not been seen by a medical provider for emotional or mental problems. (Tr. 132-35). At the time of the report, she stated she was not taking any medications. (Tr. 135). She further reported that she had x-rays and MRI/CT scans of her back and neck, both in May 2005. (Tr. 136).

In a function report dated November 3, 2008, Kauffman reported that she lives in an apartment with her children. (Tr. 138). In the morning, she wakes her children up, feeds them breakfast, and then sees her son off to school. (*Id.*). During the day, she watches some television, interacts with her two-year-old daughter, prepares lunch, straightens up her apartment, helps her son with homework, makes dinner, and prepares her children for bed. (*Id.*). She is able to care for her children. (Tr. 139). She does receive some help from her father, who takes her grocery shopping. (*Id.*). When asked what she could do before the onset of her condition that she is no longer able to do, Kauffman indicated that she can no longer lift things, turn her head in either direction, shop alone, or drive. (*Id.*). She is able to attend to her own personal

care, without any help or reminders. (Tr. 139-40). She is able to prepare meals for her family, although she mostly uses the microwave or crockpot, as opposed to cooking "full meals," because it is difficult for her to stand over the stove for any length of time without being in pain. (Tr. 140). She is able to clean the house (every day) and do laundry (once a week), although she does not do any yard work because she cannot "push or pull anything heavy" or stand on her feet for too long. (Tr. 140-41). She is able to ride in a car, but she does not leave the house alone. (Tr. 141). She says that, since her injury, she has developed "serious anxiety of crowds and people." (*Id.*). She no longer drives because she has a hard time turning her head; if she twists her neck too far, it causes her vision to blur and results in a migraine. (*Id.*). Kauffman goes grocery shopping twice a week with her father, who pushes the cart and lifts Kauffman's two-year-old daughter for her. (*Id.*). She is able to pay bills, count change, handle a savings account, and use a checkbook. (*Id.*). Her hobbies include reading, watching television, and spending time with her children. (Tr. 142). She can no longer lift her children, throw a ball with them, or "chase" them outside, and she can only read for short periods of time before her arm becomes numb and her neck painful. (*Id.*). Still, she indicated that she plays with her children, reads to them and visits with her dad and/or friends "every day." (*Id.*). She does not have problems getting along with family, friends, and neighbors, but her "social anxiety" makes it difficult for her to be in crowds of people without either her boyfriend or father present to make her feel safe. (Tr. 143).

When asked to identify functions impacted by her condition, Kauffman checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and seeing. (*Id.*). In explanation, Kauffman said:

> I can only lift at the very most 5 pounds, the things I do on my feet like walking, squatting, bending, standing and stair climbing I have to be very

4

> careful because since the injury my left side goes numb so sometimes I fall.  I can only sit for a little while and then I have to lay down to take the pressure off my neck.  Sometimes if I favor my neck the wrong way, my eyesight goes blurry and my left hand goes numb so I drop things.

(*Id.*).  When asked how far she can walk before needing to stop and rest, she indicated that it "depends" on when she starts to lose feeling or the pain in her neck gets too bad.  (*Id.*).  She has no trouble paying attention, finishing what she starts, following written or spoken instructions, or getting along with authority figures.  (Tr. 143-44).  She does not handle changes in routine well.  (Tr. 144).  She is afraid of crowds of people, people she doesn't know, and leaving her home or yard alone.  (*Id.*).

In an undated disability appeals report, Kauffman reported that her condition had worsened since her last report.  (Tr. 150).  Specifically, she "damaged" her shoulder and neck by lifting her two-year-old daughter on October 5, 2008, which resulted in increased pain and decreased mobility.  (*Id.*).  Her anxiety had also worsened, beginning in December 2008, and she had problems leaving her house and being in public.  (*Id.*).  She also said she was getting migraines more frequently and experiencing uncontrollable muscle spasms.  (*Id.*).  Since the time of her last report, she had seen Dr. Steven Schwartz for anxiety,[1] Laura Schmid-Tyler, PAC (for "general health care"), and had twice been to the emergency room at Mercy Hospital Grayling for her shoulder.  (Tr. 151-52).  She was taking ibuprofen, Ultram, and Vicodin for pain.  (Tr. 153).  She did not report any side effects from these medications.  (*Id.*).  Since her last report, she had MRIs of her neck in January and February of 2009.[2]  (Tr. 154).  In the "Remarks" section of the report, Kauffman stated:

> I cannot shower as often or wash my hair like I sue [sic] to.  My back

---

[1] The record does not contain any records from Dr. Schwartz or otherwise reflect treatment for anxiety.

[2] These MRI results are not in the record.

5

> problems are getting worse and so is my neck and shoulder. I have muscle spasms in my neck and legs constantly. The spasms happen without any warning. My neck has gotten so back [sic] I have to lay my head down frequently to relieve the pressure. My migraines are getting worse and so is the throbbing over my left eye. My vision blurs more frequently. I can't even read for more than 30 minutes without my hands going numb. My anxiety is so bad I cannot leave my home alone. I cannot grocery shop alone. I have to have someone with me at all times in public. Otherwise I become extremely afraid and over emotional. It is becoming harder and harder to be around strangers. Just going to the doctor or the store emotionally drains me.

(Tr. 156).

## 2. *Plaintiff's Testimony*

At the May 27, 2010 hearing before the ALJ, Kauffman testified that she is single and lives in a house with her father (who receives social security disability benefits himself).[3]  (Tr. 37-38). She is a high school graduate but does not have any further schooling. (Tr. 38). She is 4'10 ½" tall and weighs 165 pounds. (Tr. 38-39). Kauffman does not have a driver's license because, at one point, "a doctor put a medical restriction on it" because she could "only move [her] neck 30 percent." (Tr. 39).

Kauffman testified that for a few weeks in early 2010 she helped a friend by filing some paperwork for him and putting his business files in order; aside from that, she had not worked since May 30, 2005, when she was injured on the job and could no longer perform her duties as the manager of a Family Dollar store. (Tr. 39-40). According to Kauffman, after her injury, she could no longer unload the truck, stock the shelves, or climb ladders. (Tr. 40). She is able to do the dishes, clean the house (for 10-15 minutes at a time), do the laundry, and go grocery shopping with her father. (Tr. 40-41).

Kauffman has "constant" pain in her neck, and she also has pain in her back, shoulders and hips. (Tr. 41). The only medication she was taking at the time of the hearing was non-

---

[3] Kauffman testified that she has three children. (Tr. 43). At the time of the hearing, however, at least two of Kauffman's children were living with her mother. (Tr. 42).

prescription-strength ibuprofen. (Tr. 42). Because she does not have insurance, she does not treat with a physician (she testified that, since her youngest child was born in December 2009, she has not had regular medical treatment). (*Id.*).

Kauffman testified that it is extremely difficult for her to turn her head from side to side. (*Id.*). Indeed, she said that she "can't turn [her] head at all without pain anymore" and that doing so causes migraines and blurry vision. (*Id.*). She spends the majority of each day – anywhere from 10 to 14 hours – lying down. (*Id.*). This does not include the time she spends in bed each night. (*Id.*). She does not sleep well because of the pain. (Tr. 44-45). Kauffman further testified that she cannot lift or carry more than two pounds, and that she cannot walk more than five or six feet before needing to stop and take a break. (Tr. 45). She can only stand for five or ten minutes, and can only sit for ten minutes, before she experiences pain and has to change position. (Tr. 45-46). She also testified that, after she was injured at work, she "ended up with an anxiety of going into public . . . ." (Tr. 48).

### 3.   *Medical Evidence*

#### (a)   *Treating Physician Records*

The record contains medical records from several medical providers who treated Kauffman for her left shoulder and neck pain. The court will discuss each set of records in turn.

##### (1)   *Mercy Hospital*

Kauffman presented in the emergency department of Mercy Hospital on May 30, 2005, complaining of left shoulder pain. (Tr. 215). She indicated that she was injured while lifting some boxes at work. (*Id.*). Upon examination, she had decreased range of motion in the left upper extremity, but it was possible to get the extremity through a full range of motion. (*Id.*). An x-ray of Kauffman's left shoulder was negative, and she was diagnosed with a left rotator cuff strain. (Tr. 216, 218).

7

On June 5, 2005, Kauffman returned to the Mercy Hospital emergency department, again complaining of left shoulder pain. (Tr. 213). She denied any radiation of the pain to the upper extremity or neck. (*Id.*). She had been taking Darvocet for the pain, but had run out of these pills. (*Id.*). Her x-ray was reviewed and again found to be unremarkable. (Tr. 214).

It appears that Kauffman returned to the emergency department several years later, on March 24, 2008, complaining of bilateral ear pain. (Tr. 184). Upon examination, it was noted that Kauffman's gait and station were intact. (Tr. 187). She reported that she was taking morphine, Percocet, and Motrin for shoulder and neck pain. (Tr. 186). Kauffman "wanted opiate pain medications" for her ear and became "quite upset" when the emergency department physician indicated that a different type of medication needed to be tried first. (Tr. 187). Kauffman also wanted "five days off from work,"[4] which the treating physician felt was "not appropriate." (*Id.*). It was subsequently concluded that there was "some drug-seeking behavior here." (*Id.*).

### (2)    Dr. Charles Gosling

Kauffman first saw Dr. Charles Gosling at Grayling Family Practice on June 7, 2005, complaining of left shoulder pain. (Tr. 380-83). Upon examination, Dr. Gosling found that Kauffman's gait was intact and that her station and posture were normal. (Tr. 382). He noted that Kauffman had "full, painless range of motion of the neck," with normal stability, strength, and tone, but decreased range of motion in her left upper extremity. (*Id.*). Kauffman had full range of motion of her lower extremities, with normal strength, stability and tone. (*Id.*). Dr. Gosling was "considering" an MRI of her shoulder. (Tr. 383). He completed a "Work Restriction Evaluation" for Kauffman, indicating that she could continuously stand, bend, twist,

---

[4] It is unclear what "work" Kauffman was referring to, as she consistently reported not having worked since May 2005. *See supra* at 2, 6.

8

crouch, and walk; could not lift with her left arm (but could occasionally lift up to 25 pounds with her right arm); could push and pull only with her right arm; and should avoid ladders.  (Tr. 384).  He believed Kauffman could return to work without restrictions on June 15, 2005.  (*Id.*).

At her next visit to Dr. Gosling, on June 14, 2005, Kauffman complained that her shoulder pain had begun to radiate to her neck, left upper arm, and left elbow.  (Tr. 375).  Upon examination, however, Dr. Gosling again found that Kauffman had "full, painless range of motion of the neck," with normal stability, strength, and tone.  (Tr. 377).  He recommended MRIs of her neck and left shoulder and continued her work restrictions.  (Tr. 378-79).

Kauffman underwent MRIs of her left shoulder and cervical spine on August 11, 2005. (Tr. 161-62).  Her left shoulder MRI was "grossly unremarkable" and showed no evidence of a rotator cuff tear.  (Tr. 161).  Her cervical spine MRI was unremarkable as well.  (Tr. 162).

On August 15, 2005, Kauffman again saw Dr. Gosling for her left shoulder pain.  (Tr. 354-58).  He noted that the MRIs had been negative for obvious injury.  (Tr. 354).  Upon examination, Dr. Gosling documented that Kauffman's gait was intact and her station and posture were normal.  (Tr. 356).  He found full, painless range of motion in her neck, but decreased range of motion in the left shoulder due to pain.  (*Id.*).  Similarly, on February 9, 2006, Dr. Gosling found that Kauffman's range of motion in the left shoulder was limited mildly by pain, but she had a full, painless range of motion in the neck.  (Tr. 336).  Kauffman then underwent a course of physical therapy between March 2006 and May 2006, where it was noted that she had a decreased range of motion of her cervical spine due to pain and "significant guarding."  (Tr. 166-67, 170).

Kauffman continued to treat with Dr. Gosling throughout 2006 and 2007.  On virtually all of these visits, Dr. Gosling documented that Kauffman's gait was intact and her station and

posture were normal.  (*See, e.g.,* Tr. 238, 242, 256, 267, 272, 281, 290, 307, 311, 315, 323).

Typically, she was noted to have trapezius tenderness present, with her range of motion mildly

restricted in her neck, but with normal stability, strength, and tone.  (*See, e.g.,* Tr. 238, 242, 256,

267, 273, 281, 290, 296, 301, 323).   And, Dr. Gosling consistently noted that Kauffman had

decreased range of motion in her left upper extremity limited only "mildly" by pain.[5]  (*See, e.g.,*

Tr. 238, 243, 256, 267, 273, 281, 290, 307, 311, 315, 323).   Although Dr. Gosling re-issued work

restrictions to Kauffman on September 25, 2007 that were essentially the same as those he had

repeatedly been issuing since 2005 (Tr. 252), he concluded – without explanation – on October

9, 2007 that Kauffman was unable to work at that time.  (Tr. 251).   The following week,

however, Dr. Gosling once again found that Kauffman could work with restrictions.  (Tr. 244).

In early 2008, Dr. Gosling dismissed Kauffman from his practice for nonpayment, urging her at

the time "to taper her medication."  (Tr. 231, 233).

*(3)     Dr. Stephen Bloom*

On May 10, 2006, Kauffman saw Dr. Stephen Bloom of Rehabilitation and Physical

Medicine Specialists, P.C., for evaluation of her impairments.  (Tr. 318-19).   Dr. Bloom noted

that Kauffman had completed a course of physical therapy but "still reports a high degree of

subjective pain despite a normal examination and no significant objective residual."  (Tr. 318).

He further noted that "concerns of somatization or secondary gain are a major concern in a

situation like that."  (*Id.*).   Dr. Bloom also stated:

> . . . I did review with her that with the normal examination today with no
> residual deficits noted, that no restrictions would be needed [when returning
> to work].   In addition, I also reviewed the pathophysiology of myofascial
> pain syndromes in general and that restrictions are usually not needed.  She

---

[5] In addition, Dr. Gosling's notes indicated that Kauffman consistently had appropriate judgment
and insight, was oriented to person, place, and time, and had appropriate mood and affect.  (*See,
e.g.,* Tr. 291, 297, 302, 308, 316, 324, 329, 337, 346, 352, 365, 374, 382-83).

10

> is unhappy with this and voices displeasure that she does not feel that she
> can go back to work and is concerned about worker's compensation
> reimbursement being cut off.

(*Id.*).  Kauffman then told Dr. Bloom that she would not be able to return to her job at the Dollar Store because she had been fired due to misconduct by one of her subordinates.[6]  (*Id.*).

Overall, Dr. Bloom documented that Kauffman's physical examination was normal.  (Tr. 319).  In relevant part, Dr. Bloom noted:

> Her examination is normal.  The only abnormality I see is ongoing pain
> exaggeration that I saw back in April.  I think it is more overt and
> exaggerated.  She reports 10/10 pain that does not correlate with the normal
> objective examination that I see today.  With distraction techniques she is no
> longer tender in the cervical or paratrapezius muscles. . . . She has had a
> normal cervical and shoulder MRI as well as cervical spine x-rays which
> were normal.  There is no residual objective sequel in this particular case
> and her EMGs were all normal.

(*Id.*).  Dr. Bloom concluded that Kauffman could be released back to full-time unrestricted work once she was post-partum.[7]  (*Id.*).  Dr. Bloom cautioned "other clinicians treating her about the high degree of somatic pain complaints."  (*Id.*).  He recommended that Kauffman undergo a psychological evaluation "to look into issues of malingering or secondary gain."  (*Id.*).

### (4)     *Mid-Michigan Health Services Clinic*

Kauffman also sought treatment at the Mid-Michigan Health Services Clinic in late 2008.  On September 25, 2008, Kauffman presented with left shoulder pain, indicating that she had re-injured the shoulder picking up her child.  (Tr. 413).  She returned to the clinic on October 10, 2008, indicating that her shoulder was worse and that she was in "constant pain."  (Tr. 412).  She was prescribed additional pain medication, and physical therapy was recommended.  (*Id.*).  Three weeks later, on October 31, 2008, she returned to the clinic complaining of shoulder pain, and

---

[6] This differs from Kauffman's hearing testimony that she stopped working because she "got injured, and [] was no longer able to perform [her] duties as the manager."  (Tr. 40).

[7] At the time of this examination, Kauffman was approximately 36 weeks pregnant.  (Tr. 318).

was diagnosed with a strain.  (Tr. 411).

On November 14, 2008, Kauffman saw Laura Schmid-Tyler, a certified physician's assistant, regarding her left shoulder pain.  (Tr. 409-10).  At this visit, Kauffman indicated that she had injured her left shoulder in 2005 but had been doing "fairly well without pain meds"[8] until she picked up her daughter a few weeks earlier and re-injured the shoulder.  (Tr. 409).  Ms. Schmid-Tyler noted that Kauffman had a decreased range of motion in her neck and left shoulder and diagnosed her with an unspecified cervical disc disorder and a rotator cuff strain.  (Tr. 410).  At a follow-up visit on December 12, 2008, Ms. Schmid-Tyler re-stated these diagnoses, as well as carpal tunnel syndrome, and recommended a follow-up MRI.  (Tr. 408).

(b)   *Consultative and Non-Examining Sources*

(1)   *Dr. Paul LaClair*

On January 21, 2008, Kauffman saw Dr. Paul LaClair, a physical medication and rehabilitation specialist, for an independent medical evaluation.  (Tr. 181-83).  Dr. LaClair noted that Kauffman's cervical MRI, left shoulder MRI, and EMG had all been interpreted as normal (Tr. 181).  Kauffman reported that her ongoing activity restrictions (imposed by Dr. Gosling, apparently) included no lifting greater than five pounds with her left arm, no lifting greater than fifteen pounds with her right arm, no reaching, and no lifting above shoulder level.  (Tr. 182).  Upon examination, Kauffman's cervical rotation was reduced to both the right and the left by 50% of normal.  (*Id.*).  Cervical extension was moderately limited, and she had a decreased range of motion of the left shoulder.  (*Id.*).  Dr. LaClair found that Spurling's maneuver was equivocal to the left and negative to the right; Hoffmann's was negative bilaterally; shoulder impingement

---

[8] As described above, Kauffman was consistently taking pain medication following her 2005 injury.  Thus, her representation to a new medical provider that she had not been taking medication during this period of time is suspect.

12

signs were positive on the left and negative on the right; Tinel's test was negative over the ulnar nerve at each elbow but "mildly positive" over the median nerve at the left wrist; and Phalen's test was positive on the left at 10 seconds and negative on the right. (*Id.*). Dr. LaClair diagnosed mechanical myofascial left neck pain, cervical radiculitis, left shoulder impingement syndrome, and possible left carpal tunnel syndrome. (*Id.*). He recommended that Kauffman undergo additional diagnostic testing and indicated that her lifting and reaching restrictions would likely be permanent. (Tr. 183).

### (2)    *Dr. Dale Blum*

On December 24, 2008, Dr. Dale Blum completed a physical residual functional capacity assessment. (Tr. 417-24). Dr. Blum, a state agency medical consultant, examined Kauffman's records and concluded that she retained the ability to occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk for 6 hours in an 8-hour work day, and sit for 6 hours in an 8-hour work day. (Tr. 418). Dr. Blum also indicated that Kauffman should avoid pushing and pulling with the left upper extremity. (*Id.*). Dr. Blum further indicated that Kauffman should only occasionally stoop, kneel, crouch, and climb ramps or stairs, and she should never crawl or climb ladders, ropes, or scaffolds. (Tr. 419). Dr. Blum opined that Kauffman should avoid overhead reaching with the left upper extremity and should be limited to frequent handling, fingering, and feeling. (Tr. 420). Lastly, Dr. Blum indicated that Kauffman should avoid concentrated exposure to extreme cold, wetness, and vibration (because these conditions aggravated her neck and shoulder pain), and should avoid all exposure to hazards such as machinery and heights (because of her use of narcotic pain medication). (Tr. 421).

### (3)    *Dr. Marvin McElroy*

On August 18, 2009, Dr. Marvin McElroy completed a Medical Examination Report on

behalf of the State of Michigan Department of Human Services.  (Tr. 430-31).  Dr. McElroy did not perform any x-rays or certain other procedures as Kauffman was pregnant at the time.  Dr. McElroy opined that Kauffman could lift 10 pounds occasionally, could stand or walk less than 2 hours in an 8-hour work day, could not reach with either hand, and could not push or pull or engage in fine manipulation with her left hand.  (Tr. 431).  He indicated that Kauffman could return to work after January 2010.

*(4)     Dr. Bruce Douglass*

On December 11, 2008, Bruce Douglass, Ph.D., reviewed Kauffman's records and completed a Psychiatric Review Technique.  (Tr. 392-405).  Dr. Douglass concluded that Kauffman does not suffer from a medically determinable mental impairment.  (Tr. 392).

*4.     Vocational Expert's Testimony*

Melody Henry testified as an independent vocational expert ("VE").  (Tr. 48-57).  The VE characterized Kauffman's past relevant work as a retail manager, hotel housekeeper, restaurant counter attendant, self-service gas station attendant, bartender/waitress, and hostess as primarily unskilled or semi-skilled in nature, and ranging from light to medium exertion.  (Tr. 49-50).  The ALJ asked the VE to imagine a claimant of Kauffman's age, education, and work experience, who was able to perform light work that requires no more than 50% of normal cervical rotation; no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; and no overhead work.  (Tr. 51).  The VE testified that the hypothetical individual would not be capable of performing Kauffman's past relevant work.  (*Id.*).  However, the VE testified that the hypothetical individual would be capable of working in several light, unskilled positions, including general office clerk (54,000 jobs nationally), office machine operator (33,300 jobs nationally), and rental clerk (23,500 jobs nationally).  (Tr. 51-52).  Upon further questioning by the ALJ, the VE testified that if the hypothetical individual was limited to

14

sedentary work, she would be capable of working in the positions of administrative support worker (16,650 jobs nationally), records clerk (12,500 jobs nationally), and receptionist (37,000 jobs nationally).  (Tr. 52).  The VE further testified that none of these positions would require exposure to poor ventilation, extremes of dust, humidity, or temperature, or hazards such as heights or dangerous machinery.  (Tr. 52-53).  The majority of the positions identified did not require any pushing or pulling and would allow for a discretionary sit/stand option, but would require at least occasional bilateral use of the upper extremities for handling and fingering.  (Tr. 53, 55).

### C.      Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,

15

benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.   The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Kauffman is not disabled under the Act.  At Step One, the ALJ found that Kauffman has not engaged in substantial gainful activity since May 30, 2005, her alleged onset date.  (Tr. 13).  At Step Two, the ALJ found that Kauffman has the severe impairments of cervical disc degeneration with radiculitis and left shoulder impingement syndrome.[9]  (Tr. 13-14).  At Step Three, the ALJ found that Kauffman's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 14-15).

The ALJ then assessed Kauffman's residual functional capacity ("RFC"), concluding that she is capable of performing light work that does not require:  more than 50% of normal cervical rotation; more than occasional climbing, balancing, kneeling, crouching, or crawling; or any overhead work.  (Tr. 15-22).

At Step Four, the ALJ determined that Kauffman is unable to perform her past relevant

---

[9] The ALJ found that neither Kauffman's alleged carpal tunnel syndrome nor her alleged anxiety constituted severe impairments.  (Tr. 14).

work as a retail manager, hotel housekeeper, counter attendant, self-service gas station attendant, or bartender/waitress.  (Tr. 22).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Kauffman is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 23).  As a result, the ALJ concluded that Kauffman is not disabled under the Act.  (Tr. 24).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

17

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.     **Analysis**

Kauffman argues that the ALJ erred in: (1) failing to find that she meets or medically equals a listing; (2) conducting his RFC assessment; and (3) concluding that she could perform a significant number of jobs that exist in the national economy. Each of these arguments will be addressed in turn.

1.     *The ALJ's Conclusion that Kauffman Does Not Have a Listing Level Impairment is Supported by Substantial Evidence*

Kauffman first challenges the ALJ's conclusion at Step Three that her impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. Specifically, Kauffman argues that the ALJ erred in failing to find that she meets or equals Listing 1.04 (disorders of the spine). (Doc. #14 at 8).

18

*a.*      *The ALJ's Obligation at Step Three*

Kauffman bears the burden of proving that her impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 CFR §404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Commissioner of Soc. Sec.*, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011). "A claimant must satisfy all of the criteria to meet the listing." *Rabbers,* 582 F.3d at 653.

In this case, the ALJ found that Kauffman has the severe impairments of cervical disc degeneration with radiculitis and left shoulder impingement syndrome.[10] (Tr. 13). He then went

---

[10] As set forth above, the ALJ also concluded that Kauffman's alleged carpal tunnel syndrome ("CTS") and anxiety do not constitute severe impairments. (Tr. 14). In reaching his conclusion with respect to CTS, the ALJ pointed to Dr. LaClair's January 21, 2008 report, which merely included "possible left carpal tunnel syndrome" as one of Kauffman's clinical diagnoses. (*Id.*). The ALJ reasonably declined to accept Laura Schmid-Tyler's December 12, 2008 CTS diagnosis because Ms. Schmid-Tyler "is not an acceptable medical source for the purposes of this determination." (*Id.*, citing 20 CFR §404.1513 and 416.913). Kauffman has pointed to no objective medical evidence or laboratory findings contradicting the ALJ's conclusion, which is supported by substantial evidence.

With respect to Kauffman's alleged anxiety, any argument that this condition meets or medically equals a listed impairment likewise fails. During the two and one-half years she treated with Dr. Gosling, Kauffman never complained of anxiety, and she consistently noted that she was oriented to person, place and time and that her mood and affect were appropriate. (*See, e.g.,* Tr. 291, 297, 302, 308, 316, 324, 329, 337, 346, 352, 365, 374, 382-83). Moreover, Bruce Douglass, Ph.D., reviewed Kauffman's medical records and concluded, on December 11, 2008, that she does not have a medically determinable mental impairment. (Tr. 392). Kauffman has offered no evidence to the contrary; rather, she simply argues that the ALJ erred in giving weight to Dr. Douglass' opinion because he did not examine her. (Doc. #14 at 29). It is clear, however, that the ALJ's decision to give significant weight to Dr. Douglass' opinion was not error as he appropriately found it to be consistent with his RFC and other findings. (Tr. 22). *See* SRR 96-9p (state reviewing psychologists are considered experts in evaluating disability).

on at Step Three to consider whether those impairments, alone or in combination, meet or medically equal a listed impairment.   In doing so, the ALJ considered both Listing 1.04 (disorders of the spine) and Listing 1.02 (major dysfunction of a joint).   (Tr. 14-15).   With respect to each, the ALJ concluded, "After reviewing all of the evidence of record, I find that this impairment fails to satisfy the criteria of that listing section."   (*Id.*).   The ALJ did not explain in greater detail, *in his Step Three analysis*, exactly *why* he concluded that Kauffman's impairments do not meet or medically equal either of these listings.   Kauffman now argues that the ALJ's conclusion that she did not meet the criteria for Listing 1.04 constitutes legal error warranting remand.   (Doc. #14 at 8).

Listing 1.04A contemplates disorders of the spine, including degenerative disc disease and spinal stenosis, which result in compromise of a nerve root or the spinal cord with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 CFR Pt. 404, Subpt. P, Appx. 1, §1.04A.   As set forth above, the ALJ explicitly considered this listing in his decision, concluding that Kauffman's impairments fail to satisfy its criteria. (Tr. 14).   To the extent that Kauffman argues that the ALJ's analysis was somehow insufficient, or that he was required to explain his conclusions in greater detail, such an argument fails.

"The Sixth Circuit has consistently rejected a heightened articulation standard, noting . . . that the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis,' or to discuss every single impairment."   *Staggs v. Astrue*, 2011 WL 3444014, at *3 (M.D. Tenn. Aug. 8, 2011) (quoting *Bledsoe v. Barhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).   The *Staggs* court further stated, "Nor is the procedure so legalistic that the requisite explanation and support must be

20

located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis." *Staggs*, *supra* at *3 (citing *Bledsoe, supra* at 411); *see also Smith v. Commissioner of Soc. Sec.*, 2012 WL 4897364, at *6 (E.D. Mich. Sept. 14, 2012).  In this case, as discussed below, the ALJ's thorough decision, read in its entirety, makes clear that the ALJ appropriately considered and discussed the evidence supporting his Step Three finding, and his conclusion at Step Three is supported by substantial evidence.

                                   b.      *Substantial Evidence Supports the ALJ's Step Three Finding*

In her brief, Kauffman merely vaguely asserts that the ALJ's conclusion that she does not meet or medically equal Listing 1.04 "is believed by myself to be contrary to the Medical Exhibits in the record and new evidence of Dr. Brian McCarroll . . . ."  (Doc. #14 at 8).  Aside from the purported "new evidence," which will be discussed in greater detail below, Kauffman does not point to any specific medical evidence that supports her assertion that she suffers from a listing level impairment.  Indeed, the record evidence relied on by the ALJ indicates just the opposite.  (Tr. 15-22).

The ALJ discussed Kauffman's relevant medical history, beginning with the initial medical records following her alleged accident which showed that "it was possible to get the extremity [in question] through full range of motion" and that x-rays of her shoulder were negative.  (Tr. 16, 214-218).  At Kauffman's initial visit to Dr. Gosling on June 7, 2005, he noted that her gait was intact and her station and posture were normal.  (Tr. 16-17, 382).  Upon examination, he noted that Kauffman had "full, painless range of motion of the neck" and full range of motion of her lower extremities, with normal stability, strength and tone.  (*Id.*).  An August 2005 MRI of Kauffman's cervical spine was "unremarkable."  (Tr. 17, 162).  Dr. Bloom,

who saw Kauffman in May 2006, characterized her examination as "normal," despite the fact that she reported "a high degree of subjective pain," and he noted that "concerns of somatization or secondary gain are a major concern in a situation like that."   (Tr. 17-18, 318-319). Specifically, Kauffman had a full range of motion of her cervical spine, without any subjective reports of pain when she was distracted.  (*Id.*).  The ALJ noted Dr. Bloom's concerns that Kauffman had an issue with "malingering or secondary gain." (Tr. 18, 319).  In addition, many of Dr. Gosling's neurological examinations, conducted throughout 2006 and 2007, indicate that Kauffman had no difficulties in motor strength, gait, or sensation.  (*See, e.g.,* Tr. 18, 254, 271, 280, 300, 310, 314).   Moreover, Dr. Blum, who completed a physical residual functional capacity assessment, did not indicate that Kauffman's impairments meet or medically equal any listing.  (Tr. 417).  Finally, the ALJ noted that in August 2008 when Kauffman presented to the emergency room for an issue with her ear, her "gait and station were intact and [she] could move all of her extremities."  (Tr. 18, 187).  In sum, the ALJ's conclusion that Kauffman does not meet or medically equal Listing 1.04A is supported by substantial evidence.

> c.    *Kauffman's "New Evidence" Does Not*
> *Undermine the ALJ's Step Three Analysis*

Kauffman also argues that "new evidence" attached to her motion for summary judgment – including November 2011 and August 2012 consultative examination reports from Brian McCarroll, D.O. – supports a conclusion that she suffers from a listing level impairment.  (Doc. #14 at 8).   These reports, however, post-date the ALJ's decision by one and two years, respectively,  and  therefore  were  not  before  him  when  he  was  reviewing  the  record.  (*Id.* at Appendix A).  Such evidence cannot be considered for purposes of substantial evidence review of the ALJ's decision. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) (where the Appeals Council denies review of the ALJ's decision, evidence first submitted to the Appeals Council

cannot provide a basis for deeming the ALJ's decision unsupported by substantial evidence).

While the new evidence cannot be a basis for disturbing the ALJ's substantial evidence finding, this court may still consider whether that evidence merits remand pursuant to sentence six of 42 U.S.C. §405(g). In order for a case to be remanded back to the ALJ for consideration of new evidence under that provision, the evidence must be material, and good cause must be shown as to why it was not presented at the prior proceeding. *See* 42 U.S.C. §405(g); *Willis v. Secretary of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

Kauffman argues that she had good cause for failing to present such evidence to the ALJ, claiming that she was "without finances or means to get medical insurance or assistance or medical treatment." (Doc. #14 at 8). Even assuming that such an assertion satisfies the good cause standard,[11] she still has failed to meet her burden for a sentence six remand because there is simply no indication that Dr. McCarroll's two reports – which post-date the ALJ's decision by seventeen and twenty-six months, respectively – would have resulted in a different disposition by the ALJ. *See id.* Dr. McCarroll's November 2011 and August 2012 reports are not probative of Kauffman's condition at the time of the ALJ's June 2010 decision. *See Ferguson v. Commissioner of Soc. Sec.*, 628 F.3d 269, 277-78 (6th Cir. 2010) (medical evidence dated "over a

---

[11] This is a dubious assumption, at best, as Kauffman sought treatment from other medical providers during much of the relevant time period.

year" after the ALJ's decision, at best, "evidences a subsequent deterioration in condition" and "was properly deemed 'immaterial' because it does not necessarily speak to [the claimant's] condition at the relevant time"); *Jones v. Commissioner of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003) ("evidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial") (internal quotations omitted).   Here, there is no indication in these reports that Dr. McCarroll examined Kauffman prior to the ALJ's decision; indeed, his reports indicate that he first examined her on November 7, 2011.   (Doc. #14 at Appendix A). Moreover, the new evidence is not from a long-term treating physician, who presented a longitudinal view of Kauffman's condition.   Rather, it appears that Dr. McCarroll saw Kauffman *only* on November 7, 2011.   (*Id.*).   Thus, the new evidence is not material to Kauffman's condition during the time period adjudicated by the ALJ, and a sentence six remand is not warranted.

### 2.      The ALJ's RFC Finding is Supported by Substantial Evidence

In his decision, after discussing the record evidence, the ALJ concluded that Kauffman has the residual functional capacity ("RFC") to perform light work that does not require:  more than 50% of normal cervical rotation; more than occasional climbing, balancing, kneeling, crouching, or crawling; or any overhead work.  (Tr. 15-22).   Kauffman argues that, in reaching this conclusion, the ALJ gave improper weight to the opinions of Dr. LaClair, Dr. Bloom, and Dr. Blum.  (Doc. #14 at 9, 11, 12).   Kauffman's arguments lack merit.

First, Kauffman argues that the ALJ erred in failing to give "significant weight" to Dr. LaClair's opinion that she had permanent lifting restrictions.  (*Id.* at 9).   Contrary to Kauffman's contentions, however, the ALJ specifically stated that he <u>did</u> give Dr. LaClair's opinion significant weight.  (Tr. 20 ("Insofar as it is consistent with the residual functional capacity given above, I have assigned the medical opinion of Dr. LaClair significant weight in this case.")).   The

specific lifting restrictions imposed by Dr. LaClair – no lifting greater than 5 pounds with her left arm, no lifting greater than 15 pounds with her right arm, and no repetitive reaching with her left arm – were specifically considered by the ALJ and deemed "generally consistent with the residual functional capacity given above."   (*Id.*).   However, to the extent the ALJ declined to adopt Dr. LaClair's opinion that Kauffman could not perform repetitive lifting with her left arm, he specified that he did so because this restriction was not supported by the evidence of the record (namely, Dr. Gosling – Kauffman's treating physician – concluded that she could lift some amount of weight on at least an occasional basis).   (Tr. 20, citing Tr. 234, 244, 269, 293, 298, 317, 339).   Kauffman has not challenged Dr. Gosling's opinion in this regard, and the ALJ's conclusion is supported by substantial evidence.

Kauffman also argues that the ALJ erred in giving too much "weight and credibility" to Dr. Bloom's May 10, 2006 report.   (Doc. #14 at 11).   In his decision, however, the ALJ explicitly stated that he assigned "little weight" to Dr. Bloom's opinion.   (Tr. 21).   Indeed, Dr. Bloom opined that Kauffman could return to work without restrictions (Tr. 319), and the ALJ rejected that opinion, concluding instead that Kauffman's RFC was more limited than that.   (Tr. 21).

Kauffman next argues that the ALJ erred in ignoring parts of Dr. Blum's report.   (Doc. #14 at 12).   This is simply not the case.   The ALJ carefully reviewed Dr. Blum's December 2008 report, and reasonably rejected those limitations that were not supported by the record evidence. Specifically, the ALJ considered Dr. Blum's finding that Kauffman could never crawl (Tr. 419), opining that this finding contradicted Dr. Gosling's consistent findings that Kauffman had full range of motion in her lower extremities and that she retained the ability to perform the crouching necessary to clean her house.   (Tr. 21-22).   Thus, the ALJ reasonably concluded that

25

Kauffman could occasionally crawl. (Tr. 22). Similarly, the ALJ rejected Dr. Blum's opinion that Kauffman could only lift up to 10 pounds occasionally and less than 10 pounds frequently. (Tr. 22, citing Tr. 418). The ALJ noted that this lifting restriction conflicted with Dr. Gosling's opinion that Plaintiff could lift up to 25 pounds and Dr. LaClair's opinion that she could lift at least 20 pounds. (Tr. 22, citing Tr. 183, 244). Again, Kauffman has not challenged either Dr. LaClair's or Dr. Gosling's opinions in these respects. The ALJ's decision to reject certain portions of Dr. Blum's report is supported by substantial evidence.

Kauffman also argues that the ALJ improperly gave "little weight" to the restrictions imposed by her treating physician, Dr. Gosling.[12] The applicable regulations provide that a treating physician's opinion receives controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with the other substantial evidence in the record. 20 CFR §416.927(c)(2). If a treating source opinion is not accorded controlling weight, the ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion.[13] *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

In this case, the ALJ explicitly detailed the reasons why he did not accept all of the

---

[12] In addition, Kauffman argues that the ALJ improperly "ignored" the diagnoses of Laura Schmid-Tyler. (Doc. #14 at 8). In reality, however, the ALJ found that Kauffman has severe impairments, including some of those diagnosed by Ms. Schmid-Tyler. (Tr. 13, 408, 410). Ms. Schmid-Tyler did not state any functional limitations in her report; thus, there were no such limitations for the ALJ to "ignore."

[13] The ALJ is not required to discuss in detail each one of these factors. *See Francis v. Commissioner Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis.") (internal quotations omitted).

limitations imposed by Dr. Gosling, and the reasons he articulated are supported by substantial evidence. For example, the ALJ rejected Dr. Gosling's opinion that Kauffman could not perform any climbing because he found this opinion inconsistent with the objective medical evidence and Dr. Gosling's own progress notes, in which he consistently documented that Kauffman had full range of motion in the lower extremities and normal stability, strength, and tone. (Tr. 21, 243, 248, 256, 267, 278, 287, 291, 302, 312, 316). Similarly, the ALJ rejected Dr. Gosling's conclusion – on a note dated October 9, 2007 – that Kauffman was "[c]urrently unable to work." (Tr. 21, 251). The ALJ correctly noted that this conclusion was inconsistent with Dr. Gosling's own treatment records (including notes issued just two weeks earlier and two weeks later) indicating that she could work with restrictions. (Tr. 21, 244, 252).

In summary, the ALJ provided a detailed, extensive and well-reasoned discussion of the medical evidence of record. His RFC analysis is supported by substantial evidence.

### 3. The ALJ's Conclusion that Kauffman Can Perform A Significant Number of Jobs that Exist in the National Economy is Supported by Substantial Evidence

As set forth above, substantial evidence supports the ALJ's RFC assessment. After making a determination as to Kauffman's RFC, the ALJ then asked the VE to imagine a claimant of Kauffman's age, education, and work experience, who was able to perform light work that requires no more than 50% of normal cervical rotation; no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; and no overhead work. (Tr. 51). The VE testified that the hypothetical individual would be capable of working in a significant number of jobs that exist in the national economy.[14] (Tr. 51-52).

---

[14] The VE testified as to the number of jobs available nationally – general office clerk (54,000), office machine operator (33,300), rental clerk (23,500), administrative support worker (16,650), records clerk (12,500), and receptionist (37,000). (Tr. 51-52).

An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has workplace restrictions.  *See Wilson*, 378 F.3d at 548.  Kauffman argues that the ALJ erred in relying on the VE's testimony regarding the number of jobs available nationally for a person of her age, education, vocational background, and limitations.   (Doc. #14 at 30-31).   She contends that reliance on national figures was "unrealistic," given the unemployment rate in her local area, her inability to drive, and the fact that she cannot relocate.  (*Id.*).

As the Commissioner correctly points out, however, those factors are not relevant to the salient question of whether the claimant can *perform* a significant number of other jobs.  *See Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999) (extrinsic factors affecting a claimant's ability to commute should not be considered).  Moreover, the applicable regulations specifically provide:  "It does not matter whether … [w]ork exists in the immediate area in which you live…."  20 CFR §416.966(a)(1).  Thus, the Commissioner "is not required to provide evidence that job opportunities exist in a claimant's local economy."  *Scheuneman*, 2011 WL 6937331, at *10 (citing *Harmon, supra* at 292); *see also Roby v. Commissioner of Soc. Sec.*, 48 F. App'x 532, 539 n. 3 (6th Cir. 2002) ("The Commissioner is not required to show that jobs exist within a local commuting area.").  Regardless, then, of whether specific jobs exist in Kauffman's local area, the VE identified a significant number of jobs that exist in the national economy that someone with Kauffman's vocational profile could perform.  (Tr. 51-52).  Accordingly, the VE's testimony provides substantial evidence to support the ALJ's finding that Kauffman was not disabled.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Kauffman's Motion for Summary Judgment [14] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: December 28, 2012                    s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 28, 2012.

                                            s/Felicia M. Moses
                                            FELICIA M. MOSES
                                            Case Manager